**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  08a0058n.06
Filed:  January 16, 2008

**Case No. 06-5329**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| JACK E. HOWTON, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

**BEFORE:  RYAN, BATCHELDER, and GRIFFIN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.**  Jack E. Howton appeals his convictions

relating to a methamphetamine conspiracy.  On April 6, 2005, a federal grand jury returned a seven

count indictment against Howton.  Count I alleged that Howton engaged in a conspiracy to possess

with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§

841(a)(1), 841(b)(1)(A), and 846.  Count II charged Howton with attempting to possess with intent

to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A), and 846.  Count III alleged that Howton distributed 50 grams or more of

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Count IV charged

Howton with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and

924(a)(2). Counts V and VI charged Howton with intimidating two different witnesses, in violation

of 18 U.S.C. § 1512(b)(2). And in Count VII, the government sought forfeiture pursuant to 21 U.S.C. § 853. Howton pled guilty to Count IV, felon in possession of a firearm, and proceeded to trial on the remaining counts. The jury found Howton guilty on Counts I-III, V, and VI. The district court imposed a life sentence. Howton timely appealed his convictions.

## I. BACKGROUND

On September 23, 2003, in Kansas, Trooper Rule initiated a traffic stop after observing a van twice drift over the right lane marker onto the shoulder. The van was a one-way rental from California to Kentucky with the rental agreement in Howton's name. Howton was one of the van's passengers.

When Trooper Rule approached the van to speak with the driver, he noticed an open beer can in the dashboard cup holder. Trooper Rule asked Howton for permission to search the van, and Howton refused. Because it is illegal in Kansas to transport open containers of alcohol in a vehicle, Trooper Rule believed that he had probable cause to search the van for any other open containers of alcohol. Trooper Rule, joined by Trooper Phillips, began a search of the van for open containers. Trooper Rule searched the driver and front passenger seats and then the rear cargo area of the van, which was accessible from inside the vehicle. While Trooper Rule was searching the cargo area, Trooper Phillips searched the passenger rows behind the driver's seat, where he spotted a Crown Royal bag underneath one of the rows of passenger seats. Upon opening the bag, Trooper Phillips found what appeared to be a crack pipe and marijuana, and having found the suspected drugs and drug paraphernalia, the officers believed they had probable cause to search the van for drugs or drug-related paraphernalia. Trooper Rule then opened a closed laptop computer case located in the van's cargo area and found 4.8 pounds of methamphetamine inside.

2

Approximately six days later, Agent Kirk Steward of the Bureau of Alcohol, Tobacco and Firearms ("ATF") arrested Howton on a federal arrest warrant. Later that day, Agent Steward advised Howton of his *Miranda* rights, and Howton made incriminating statements to the agent.

While incarcerated in the county jail, Howton wrote two letters to a friend, Reggie Lickey, in which Howton urged Lickey to convince "Larry" and "Judy" — two individuals who were scheduled to testify in Howton's upcoming trial — not to testify but to invoke their Fifth Amendment rights against self-incrimination. A jail official who had been alerted to the likelihood that Howton would be sending these letters to Lickey, seized the letters and held them for 24 hours, until Agent Steward obtained a search warrant to open them. While he was incarcerated, Howton also wrote several letters to his wife, suggesting, among other things, that she assist him in escaping from jail.

Prior to trial, Howton moved to suppress the evidence seized in the Kansas stop, the statements he made to Agent Steward, and the letters he wrote to his wife. During trial, Howton's counsel moved to suppress the letters Howton had written to Lickey. The district court denied Howton's motions and admitted into evidence the drugs, statements, and letters.

On appeal, Howton, through counsel, challenges (1) the denial of his motion to suppress the drug contraband seized during the traffic stop in Kansas; (2) the denial of his motion to suppress statements he made to Agent Steward; (3) the admission at trial of the letters Howton wrote to Reggie Lickey; and (4) the admission at trial of the letters Howton wrote to his wife, Jessi Howton.[1] Howton has also filed a pro se brief in which he raises other arguments concerning his convictions.

---

[1]Additionally, Howton asserts that he should be re-sentenced under *United States v. Booker*, 543 U.S. 220 (2005). Because he offers no legal argument in support of this claim, he has waived it. *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

## II. ANALYSIS

**A. Suppression of drug evidence, statements to Agent Steward, and letters to Reggie Lickey**

When considering the district court's denial of a motion to suppress, "'we review the district court's findings of fact for clear error and its conclusions of law de novo.'" *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (quoting *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)). When we review the district court's findings of fact, "we consider evidence in the light most favorable to the government," *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), and "'in the light most likely to support the district court's decision.'" *Hurst*, 228 F.3d at 756 (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir.1999)). And we must defer to the district court's credibility assessments. *See Hill*, 195 F.3d at 264-65.

Howton first argues that Trooper Rule lacked probable cause to stop the van,[2] to search the van, and to search the closed computer case in the luggage compartment of the van.

> "A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Accordingly, a roadside detention is lawful so long as the officer has probable cause to believe that the motorist has violated the traffic laws. *See United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003).

*United States v. Garrido*, 467 F.3d 971, 977-78 (6th Cir. 2006).

In Kansas, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can

---

[2]A panel of this court recently noted that "[c]aselaw in this circuit is in conflict as to whether an officer must possess 'probable cause' as opposed to only 'reasonable suspicion' in believing that a traffic violation has occurred before stopping the vehicle in question." *United States v. Westmoreland*, 224 F. App'x 470, 473 (6th Cir. 2007) (citing *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) and "noting a discrepancy in Sixth Circuit caselaw between applying the probable-cause and reasonable-belief standards to traffic-violation stops"). Because Howton argues in terms of probable cause and "because the issue is not determinative of the outcome in the case before us, we will assume without deciding that the more stringent probable-cause standard applies." *Id.*

4

be made with safety." KAN. STAT. ANN. § 8-1522(a); *see also United States v. Kerr*, 35 F. App'x 728, 731 (10th Cir. 2002) (The troopers' "observation of defendant drifting outside of his lane twice within a short span of time constitutes a violation of Kan. Stat. Ann. § 8-1522(a)."). The court did not err in finding that Trooper Rule had probable cause to stop the van. Trooper Rule testified that he saw the van cross the right lane marker onto the shoulder twice, and that each time, the van was over the right lane marker by about a foot. The district court credited this testimony, partly because the driver admitted that it was possible she crossed over the right lane marker.

Likewise, the district court did not err in finding that Troopers Rule and Phillips had probable cause to search the van for open containers of alcohol and probable cause to search the van, and its contents, for drugs and drug-related paraphernalia. Kansas law provides that:

> No person shall transport in any vehicle upon a highway or street any alcoholic beverage unless such beverage is:
>
> (1) In the original unopened package or container, the seal of which has not been broken and from which the original cap, cork or other means of closure has not been removed;
>
> (2) (A) in the locked rear trunk or rear compartment, or any locked outside compartment which is not accessible to any person in the vehicle while it is in motion; or (B) if a motor vehicle is not equipped with a trunk, behind the last upright seat or in an area not normally occupied by the driver or a passenger . . . .

KAN. STAT. ANN. § 8-1599(b).

"To protect against unreasonable searches and seizures, police officers are generally required to obtain a valid search warrant, rendering 'searches conducted outside the judicial process, without prior approval by judge or magistrate, per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Guy*, 1 F. App'x 410, 412 (6th Cir. 2001) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of

5

these "well-delineated exceptions" is the automobile exception, which "allows the police to 'search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.'" *Id*. (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Critically, "[t]he scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that [the contraband] may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982).

Here, Trooper Rule discovered that at least one passenger in the van had violated Kan. Stat. Ann. § 8-1599(b): there was an open container of alcohol in the van that was neither locked in the trunk nor "behind the last upright seat or in an area not normally occupied by the driver or a passenger." The troopers then had probable cause to search for any other similar contraband, i.e., any open containers of alcohol being transported in the vehicle in violation of state law. *See*, *e.g.*, *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) ("Once Trooper Newman discovered that McGuire was transporting open, alcoholic liquor in violation of Illinois law, . . . he had probable cause to believe that the car contained additional contraband or evidence," which "gave Newman the authority to search every part of the vehicle and its contents that could conceal additional contraband.").

Trooper Phillips testified that while he was searching in and around the rows of passenger seats — an area where Kansas law prohibits open containers of alcohol — he spotted a Crown Royal bag underneath the front row of passenger seats. Because Crown Royal is a type of alcoholic beverage and because the bag could have contained an open, i.e., unsealed, container of alcohol, Trooper Phillips opened the bag. Once Trooper Phillips spotted the suspected marijuana and crack

6

pipe inside the Crown Royal bag, the scope of the troopers' search changed; having probable cause to believe that there would be illegal drugs in the vehicle, the troopers could now search in containers where drug contraband could be found.[3] That is, as the district court concluded, "once this discovery was made, the permissible scope of the search was expanded to include every part of the vehicle and its contents that could conceal drugs or drug paraphernalia," which would include the closed laptop bag in the van's cargo area, in which Trooper Rule found the 4.8 pounds of methamphetamine.

Howton next challenges the admission of the statements he made to Agent Steward. After Howton was arrested by the Kansas troopers, Trooper Rule advised him of his *Miranda* rights, and Howton refused to talk with the officers about the drugs found in the van. Later that same day, a booking officer asked Howton "how much meth did [you] have?" and Howton responded with incriminating statements. At trial, the government conceded that the statement to the booking officer was inadmissible.

On appeal, Howton argues that this inadmissible confession to the Kansas booking officer tainted the confession he made to Agent Steward six days later, after again being advised of his *Miranda* rights. Howton asserts that it was "useless to continue to remain silent given that he had already incriminated himself" in his statement to the booking officer.

The Supreme Court has held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda v. Ariz.*, 384 U.S. 436, 474, 479 (1966)). The police violate *Mosley*'s admonition where

---

[3]Howton argues that Trooper Rule opened the laptop case *before* Trooper Phillips opened the Crown Royal bag and found the drug contraband. The district court, however, credited Trooper Rule's testimony that he opened the computer bag *after* Trooper Phillips found the marijuana in the Crown Royal bag.

7

they "fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id*. at 105-06.

The district court correctly concluded that Agent Steward scrupulously honored Howton's right to cut off questioning. The interrogation with Agent Steward took place six days after Howton's encounter with the booking officer and "was conducted by a different law enforcement authority in a different state," after Agent Steward had given Howton fresh *Miranda* warnings and Howton had signed a form waiving his rights. Under these circumstances, the district court did not err in denying Howton's motion to suppress his statements to Agent Steward.

Howton next argues that the county jail official's seizure of his letters to Reggie Lickey, before Agent Steward obtained a search warrant, provides grounds for suppressing the letters. As the government argues, however, upon reasonable suspicion, government officials may detain private mail. For instance, in *United States v. Van Leeuwen*, 397 U.S. 249 (1970), the Supreme Court determined that postal officials did not violate the Fourth Amendment when, based upon reasonable suspicion, the officials held two packages for twenty-nine hours until a search warrant could be obtained. *See also United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) ("A temporary detention of mail for investigative purposes is not an unreasonable seizure when authorities have a reasonable suspicion of criminal activity."). Even giving Howton the benefit of treating his prison mail as private mail, so long as the jail officials had a reasonable suspicion of criminal activity, their brief detention of the letters did not violate the Fourth Amendment. *Cf. United States v. Kelton*, 791 F.2d 101, 103 (8th Cir. 1986) (addressing federal regulations) ("[A]lthough prisoners retain some fourth amendment rights while in prison, these rights are limited by institutional security needs and

8

the prisoner's reduced expectation of privacy.").

The district court concluded that the county jail official "detained" the letters for about 24 hours before she received the search warrant. The record reflects that in his affidavit to obtain the search warrant for the letters, Agent Steward averred that an inmate incarcerated with Howton stated that Howton had told him that Howton was sending a letter to "Reggie" to have Reggie intimidate a witness in Howton's case into changing his testimony. The jail official, therefore, had a reasonable suspicion of criminal activity and detained Howton's letters long enough for Agent Steward to obtain a search warrant. The court did not err in finding that the seizure was reasonable and in permitting the admission into evidence of the letters to Reggie Lickey.

## B. Letters to Jessi Howton

Prior to trial, Howton moved to suppress letters he wrote to his wife, Jessi, asserting that the letters were protected by the marital communications privilege. The government sought to introduce four letters, arguing that the privilege did not apply because the letters were not intended to be private and/or contemplated joint criminal activity. Our review of the letters persuades us that, with the exception of letter four, the court did not abuse its discretion in admitting the letters into evidence. The first two letters explicitly contemplate — as the government contends — joint criminal activity, including escape from jail, the bringing of a gun to Howton in jail, the manufacture of methamphetamine, and the hiring of a hit man to kill witnesses. *See United States v. Howard*, 216 F. App'x 463, 371 (6th Cir. 2007) (exception to confidential marital communications privilege exists for conversations regarding joint ongoing or future illegal activity). The third letter instructs Jessi to tell others about the content of the letter and to show the letter to the federal authorities, and Howton's protestations that this letter was an exercise in sarcasm does not vitiate the explicitly

9

expressed intention that the letter not be kept private.

In letter four, Howton instructs his wife to contact his attorney and speak with the attorney about Howton's case. The district court concluded that Howton did not intend for this letter to remain confidential, and, therefore the marital communications privilege did not apply. *See*, *e.g.*, *Pereira v. United States*, 347 U.S. 1, 6 (1954) ("Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private."). We disagree and conclude that Howton intended that this letter remain confidential because Howton was asking his wife to speak to his attorney, on his behalf, about her testimony at trial, which is the equivalent of her presence during a conversation among the three of them about Howton's trial strategy. The admission of this letter, however, was harmless error in light of the other evidence presented by the government.

Finally, Howton raises a number of arguments in his pro se brief. We decline to address these arguments because Howton was represented by counsel in this matter. *See*, *e.g.*, *United States v. Jenkins*, 229 F. App'x 362, 370 (6th Cir. 2005) ("[W]e do not ordinarily consider pro se claims brought by a defendant represented by counsel on appeal.").

### III. CONCLUSION

Accordingly, for the foregoing reasons, we **AFFIRM** the judgment of the district court.

10