NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0234n.06
Filed: March 2p, 2007

No. 06-3549

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ROBERT J. WESTMORELAND, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: NORRIS, GILMAN, and McKEAGUE, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Two police officers in Columbus, Ohio,

following a vehicle that other officers had spotted leaving a suspected "crack house," initiated a

traffic stop after observing that the vehicle failed to signal before making a left-hand turn. Robert

J. Westmoreland, a passenger in the vehicle, was found to be in possession of a handgun and loose

ammunition. He was subsequently charged with being a felon in possession of both items.

Before the district court, Westmoreland challenged the admissibility of the firearm and the

ammunition seized from him on the grounds that the officers did not have probable cause to believe

that a traffic violation had actually occurred. The district court ultimately denied the motion to

suppress. Westmoreland then pled guilty pursuant to an agreement that gave him the right to appeal

the district court's denial of his motion. For the reasons set forth below, we **AFFIRM** the judgment

of the district court.

## I. BACKGROUND

In January of 2005, Columbus Police Officer Smith Weir was surveilling a residence

suspected of involvement in narcotics trafficking. He observed a Ford Bronco arrive at the house

and then depart shortly thereafter. The Bronco was driven by Steven Bryant, with Westmoreland

riding in the passenger seat. After the vehicle departed, Weir radioed to other police units in the area

that the Bronco had left a suspected crack house. He requested that officers follow the Bronco and

stop the vehicle if they observed any traffic violations. Another officer heard this radio transmission

and located the Bronco, but failed to initiate a stop because he did not observe any traffic violations.

Instead, he relayed the Bronco's direction of travel to Officers John Davis and Mark Fester who were

also on patrol in the area. They heeded this transmission and began following the Bronco.

Officers Davis and Fester observed the Bronco traveling southbound on Parkwood Avenue

in Columbus, Ohio. As the vehicle approached the intersection of Parkwood and Mock Road, it

turned left onto Mock without signaling and proceeded eastbound. The intersection of Parkwood

and Mock is not a four-way stop. It instead forms a "T," whereby vehicles traveling south on

Parkwood have the choice to either continue south on Parkwood or to turn left and proceed east onto

Mock. But Parkwood continues south for only a short distance beyond the intersection, and the only

traffic signal at the intersection is a stop sign for northbound vehicles approaching the intersection

from the southern continuation of Parkwood. Consequently, the majority of westbound traffic on

Mock and southbound traffic on Parkwood rounds the turn at the intersection of the two roads without stopping. Both Parkwood and Mock are marked with double-yellow lines down the center, but the curved intersecting portion of the roads is marked with a dotted-yellow line.

Officers Davis and Fester observed that the Bronco had failed to display a turn signal prior to making the turn onto Mock Road, despite Columbus's traffic ordinance requiring drivers to signal before making a turn on a street or highway. Columbus, Oh., Traffic Code § 2131.14(a). Believing that the Bronco's driver had violated this traffic ordinance, the officers initiated a stop. During the course of the stop, the officers detected a strong smell of marijuana coming from the vehicle. One of the officers approached the passenger side of the vehicle and noticed that neither occupant was wearing a seatbelt. When the officer asked Westmoreland for identification, the latter became agitated and a struggle ensued. Westmoreland was forcibly removed from the vehicle and handcuffed, whereupon five .44 magnum rounds of ammunition fell from his right hand. As Westmoreland was being led to the squad car, an unloaded Smith and Wesson .44 caliber revolver fell from his left side. The officers ultimately arrested Westmoreland on weapons charges and cited Bryant for the turn-signal infraction and for failing to wear a seatbelt.

Westmoreland was indicted by the grand jury for being a felon in possession of ammunition under Count One and for being a felon in possession of a firearm under Count Two, both in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress the seized ammunition and firearm on the ground that the officers lacked probable cause to initiate the traffic stop in the first place. At the suppression hearing, Westmoreland called several witnesses, including Brad Craley, an investigator with the Federal Public Defender's Office. Craley testified that he had conducted a 30-minute survey

of the intersection in question and observed that only 12 of 152 vehicles (or 8%) signaled when turning left onto Mock from Parkwood. Andrew Beard, a development engineer for the City of Columbus Transportation Division, was also called as a witness for Westmoreland. Beard stated that city engineers had "improved the radius on the northeast corner to make it a bit wider" to allow traffic to round the turn without having to make a complete stop. In Beard's opinion, motorists turning left onto Mock from Parkwood would not have to signal before turning.

In response to Westmoreland's witnesses, the government called Bill Lewis, a Columbus City traffic engineer. Lewis testified that his position with the city did not require him to be familiar with the traffic codes, and that he would therefore not be qualified to assess whether or not a turn signal was required at a given intersection. As the government concedes, the district court's opinion erroneously characterized Lewis's testimony as stating his belief that the intersection in question required the use of a turn signal. Finally, the government called Officers Davis and Fester, who both testified that the driver of the Bronco committed a traffic violation by failing to signal before making the turn in question.

The district court ultimately denied Westmoreland's motion to suppress. Westmoreland then signed a conditional plea agreement, pursuant to which he pled guilty to Count One of the indictment in exchange for the government dropping Count Two and permitting him to appeal the district court's denial of his motion to suppress. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

We review the denial of a motion to suppress de novo, but will not set aside the district court's factual findings unless they are clearly erroneous. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). A factual finding "is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citation and quotation marks omitted). Furthermore, this court accords "deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination." *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999). The evidence must be considered in the light most favorable to the party that prevailed in the court below—in this case, the government. *See id.* at 264.

**B.      The vehicle stop was supported by probable cause**

In a very recent traffic-violation case, this court noted that "[t]he relevant inquiry is whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation in fact occurred." *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007) (holding that an officer's stop of a vehicle following within 10 feet of another vehicle was supported by probable cause where a local ordinance prohibited following "more closely than is reasonable and prudent."). "Probable cause is generally defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003) (citation and quotation marks omitted). The doctrine of probable cause represents "a flexible, commonsense standard that requires that the facts available to the officer would warrant a man of reasonable caution" in the belief that a violation has occurred. *Id.* (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)) (brackets omitted).

Caselaw in this circuit is in conflict as to whether an officer must possess "probable cause" as opposed to only "reasonable suspicion" in believing that a traffic violation has occurred before stopping the vehicle in question. *See Sanford*, 476 F.3d at 394 (noting a discrepancy in Sixth Circuit caselaw between applying the probable-cause and reasonable-belief standards to traffic-violation stops). Because both parties argue in terms of probable cause, and because the issue is not determinative of the outcome in the case before us, we will assume without deciding that the more stringent probable-cause standard applies.

The district court below thoroughly examined the traffic ordinance at issue, the nature of the intersection, and the circumstances of the traffic stop. Under the applicable Columbus traffic ordinance,

> [n]o person *shall turn a vehicle* or move right or left upon a street or highway unless or until such person has exercised due care to ascertain that the movement can be made with reasonable safety nor *without giving an appropriate signal* in a manner hereinafter provided.
>
> When required, a signal of intention to turn or move right or left shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.
> . . .
> Any stop or turn signal required by this section shall be given either by means of the hand and arm, or by signal lights that clearly indicate to both approaching and following traffic intention to turn or move right or left . . . .

Columbus, Oh., Traffic Code § 2131.14(a). (Emphasis added.) Westmoreland does not contest the officers' assertion that the vehicle in which he was a passenger failed to signal prior to making the turn at issue. The district court found that the Bronco

> was proceeding southbound and turned and proceeded eastbound. Although the radius of the turn has been increased, the movement involved a 90 [degree]

directional difference from southbound to eastbound. The change in direction caused the vehicle to travel from one roadway onto another distinct roadway.

Applying its factual findings to the traffic ordinance at issue, the district court concluded that the officers had probable cause to believe a violation of § 2131.14(a) had occurred.

Westmoreland first argues that the district court's findings of fact are clearly erroneous, but he provides little support for this assertion. He claims that "the evidence clearly established that Parkwood flows into Mock in a continuous roadway which is uncontrolled by any traffic device." This characterization is itself erroneous, however, in light of Westmoreland's acknowledgment that a stop sign regulates traffic proceeding northbound on Parkwood through the intersection in question. Similarly, the testimony of Westmoreland's expert that the city had widened the road slightly to accommodate greater traffic flow between Mock and Parkwood does not refute the district court's factual findings. Westmoreland does not dispute that southbound drivers on Parkwood have the option of either turning left onto Mock or continuing straight on Parkwood beyond Mock. He thus cites no evidence that leads to a "definite and firm conviction that a mistake has been committed" regarding the district court's factual findings. *See Tran*, 447 F.3d at 943.

Westmoreland next argues that proceeding from Parkwood left onto Mock does not amount to a "turn" within the meaning of § 2131.14(a). Significantly, Westmoreland cites no law whatsoever in support of this argument. He instead relies on empirical evidence that is not only unpersuasive, but legally irrelevant. Westmoreland points to the informal study conducted at the intersection by a member of the Federal Public Defender's Office, which found that 92% of vehicles failed to signal when turning left onto Mock from Parkwood. No authority cited by Westmoreland,

however, establishes that such a practice is relevant to the issue of whether the officers had probable cause to believe that Westmoreland had violated the ordinance in question.

As this court has previously explained, "[i]t is . . . irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." *Ferguson*, 8 F.3d at 391. The probable-cause standard, moreover, "is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note." *Id*. at 392. Whether most vehicles on a given roadway are, for example, exceeding the speed limit is irrelevant to the issue of whether an officer may have probable cause to pull over an individual vehicle for a speeding infraction. *See, e.g., United States v. King*, No. 05-6399, 2006 WL 3705188, at *2 (10th Cir. Dec. 18, 2006) (upholding a traffic stop as supported by probable cause where an officer had clocked the defendant as driving 73 miles per hour in a 70 mile-per-hour zone); *cf. United States v. Garrido*, 467 F.3d 971, 980 (6th Cir. 2006) (noting that, although law enforcement officers might be unlikely to enforce a following-too-closely ordinance under congested traffic conditions, "the law does not require them to be lenient.").

In addition to the empirical evidence, Westmoreland relies on the testimony of Andrew Beard, a development engineer for the City of Columbus Transportation Division who possesses no legal training or law-enforcement experience. Beard's opinion that motorists turning left onto Mock from Parkwood would not have to signal carries little weight in our determination regarding the interpretation and applicability of Columbus's traffic ordinance. Westmoreland argues that, as a city engineer, Beard is "more objective" than Officers Davis and Fester. This argument appears to

intimate that the stop in question was simply pretextual. Under this court's Fourth Amendment precedents, however, an officer's subjective motivation for stopping a vehicle is irrelevant if the officer has probable cause to believe that a traffic violation has in fact occurred. *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

Regardless of Beard's or the officers' testimony, the facts of this case present every reason to apply the plain language of the ordinance that unequivocally requires signaling before "turn[ing] a vehicle . . . upon a street or highway." Columbus, Oh., Traffic Code § 2131.14(a). The district court aptly pointed out that northbound vehicles waiting at the Parkwood stop sign might benefit from oncoming southbound vehicles signaling their intention to either proceed south directly past the stopped vehicles or to turn eastbound into the such vehicles' intended path. Similarly, vehicles trailing southbound vehicles on Parkwood might benefit from the knowledge that the lead vehicle intends to turn left onto Mock (which would require a decrease in speed) instead of proceeding straight on Parkwood. *See* § 2131.14(a) (requiring drivers to signal "to both approaching and following traffic [an] intention to turn.") A contrary ruling would require reading exceptions into the language of the ordinance and muddying an otherwise clear requirement.

Ohio courts have enforced identical turn-signaling ordinances as applicable to other non-standard intersections, including "Y"-type intersections and those requiring 45-degree turns. *See, e.g., State v. Hoder*, No. 03CA0042, 2004 WL 1343573, at *4 (Ohio Ct. App. June 16, 2004) (holding that failing to signal when proceeding through a "Y" intersection constituted a violation); *State v. Beacham*, No. 03CA36, 2003 WL 22763534, at *3 (Ohio Ct. App. Nov. 18, 2003) (finding

a violation where the defendant failed to signal before executing a 45-degree turn). Rather than citing contrary authority, Westmoreland attempts to distinguish these cases by stating that they did not involve the empirical evidence or expert testimony that he presented below. But because such evidence is itself unpersuasive, Westmoreland's attempt to distinguish the cases cited by the government is unavailing.

Officers Davis and Fester, in sum, possessed probable cause to believe that the vehicle in which Westmoreland was traveling had violated Columbus, Oh., Traffic Code § 2131.14(a). Westmoreland's motion to suppress was therefore properly denied because no constitutional violation occurred.

After concluding that the stop was supported by probable cause, the district court further opined in dicta that the good-faith exception to the exclusionary rule would not have applied if the officers reasonably but mistakenly believed that the Bronco's failure to signal constituted a traffic violation. *Compare United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006) (agreeing with the Fifth, Ninth, Tenth, and Eleventh Circuits that an officer's reasonable misunderstanding of law cannot justify application of the good faith exception to the exclusionary rule) *with United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (reaching the opposite conclusion). Neither party has briefed this issue. For this reason, and because we are affirming the district court's opinion on other grounds, we have no need to address whether the good-faith exception could apply here.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.